In the

# United States Court of Appeals
### For the Seventh Circuit

No. 00-4230

A.D. BROKAW,

*Plaintiff-Appellant,*

v.

KAREN WEAVER, MERCER COUNTY,
STATE OF ILLINOIS, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 00 C 4052—**Joe B. McDade**, *Chief Judge.*

SUBMITTED MARCH 15, 2002[1]—DECIDED SEPTEMBER 13, 2002

Before RIPPLE, MANION, and DIANE P. WOOD, *Circuit Judges.*

MANION, *Circuit Judge.* In 1983, three-year old A.D. Brokaw was removed from her parents' home based on allegations of child neglect. After she turned eighteen, A.D. sued her paternal grandfather, aunt and uncle (who was

---

[1] This case has been treated as a successive appeal and sub-mitted to the original panel under Operating Procedure 6(b). The panel has concluded that another oral argument is unnecessary. *See* Fed. R. App. P. 34(a); Cir. R. 34(f).

a Deputy Sheriff with the Mercer County Sheriff's Office), alleging that they conspired to violate her constitutional rights by reporting false claims of child neglect. A.D. also sued the various state actors and agencies involved in removing her from her parents' custody. The district court held that A.D.'s suit was barred by the *Rooker-Feldman* doctrine because, in effect, A.D. was challenging the validity of the state removal proceedings. A.D. appeals. We reverse and remand this case for further proceedings.

## I.

In July 1983, six-year-old C.A. Brokaw and his three-year old sister A.D. Brokaw were forcibly removed from their parents' home by a Mercer County Deputy Sheriff and a Mercer County Probation Officer. The Brokaw children claimed that their removal resulted from a conspiracy between their paternal grandfather, Weir Brokaw, paternal aunt, Karen Weaver, and paternal uncle, James Brokaw (who was a Deputy Sheriff for Mercer County), and other Mercer County and state officials. Specifically, the children alleged that because their father's family disapproved of their parents' religious beliefs and practices, they conspired to falsely accuse them of child neglect in order to cause the state to remove C.A. and A.D. from their home and thereby cause the breakup of the family.

According to C.A. and A.D., to further this scheme, on July 6, Deputy James Brokaw enlisted the aid of the Sheriff of Mercer County, Marvin Thirtyacre. Sheriff Thirtyacre in turn contacted Penny Ingersoll, a caseworker for the Illinois Department of Children and Family Services (IDCFS), and they arranged to meet later that day. That afternoon Thirtyacre, Weir, Karen and James met briefly with Ingersoll outside a courthouse in Aledo, Illinois, and

a few minutes later, Judge Susan Gende joined them. During this meeting, Thirtyacre, Weir, Karen and James allegedly falsely claimed that C.A. and A.D. were victims of child neglect. According to the defendants, Judge Gende orally ordered C.A. and A.D. to be removed from their parents' home. What exactly transpired at that meeting, however, is unclear because there was no official record compiled during that meeting; in fact, at that time there was no official proceeding pending involving C.A. and A.D. In any event, Judge Gende did not issue any written order concerning the removal of C.A. and A.D. Nonetheless, that evening two men entered the home of Dennis and Bonnie Brokaw and removed C.A. and A.D. When their parents chased the unknown intruders, demanding to know what was going on, one of the men allegedly replied: "We don't have to tell you a damn thing!" Both C.A. and his parents believed the children had been kidnaped and the Brokaws called the police. It wasn't until later that they learned that the children were removed based on allegations of child neglect.

The following day, on July 7, Sheriff Thirtyacre filed a petition for the adjudication of wardship in state court. The state court (Judge Berglund) ordered C.A. and A.D. to remain in foster care, where they had been placed after their removal the prior day. Neither C.A. nor A.D. was present at that hearing, nor were they represented by an attorney or a guardian ad litem. C.A. and A.D.'s parents, while present at the hearing, were also not represented by counsel, and they were not allowed to speak, call witnesses, or cross-examine witnesses. In fact, there wasn't even a court reporter present at the hearing. On August 3, 1983, Judge Gende adjudicated C.A. and A.D. wards of the state, but then on October 28, 1983, a state court ordered the children returned home, finding no continuing

basis to hold the children. At that point A.D. and C.A. had been separated from their parents and home for approximately three months.

In February 1997, after he reached the age of majority, C.A. filed a *pro se* complaint in federal court alleging various state law and federal constitutional claims against the various individuals involved in instigating, investigating, directing, or overseeing the removal of him and his sister from their parents. The defendants included Mercer County; Marvin Thirtyacre, the Mercer County Sheriff; James Brokaw, a Mercer County Deputy Sheriff and C.A. and A.D.'s paternal uncle; Weir Brokaw, their paternal grandfather; Karen Weaver, their paternal aunt; the State of Illinois; Penny Ingersoll, a caseworker for the IDCFS; Steve Dickens, a caseworker for the IDCFS; Susan Gende, a state judge in the 14th Judicial Circuit of Illinois; James Bartelt, the Director of the Mercer County Probation Department; Jonathon Weakley, a Mercer County Deputy Sheriff; and Vickie Hansen, a Mercer County Probation Officer. *Brokaw v. Mercer County*, 235 F.3d 1000, 1008 (7th Cir. 2000). Specifically, C.A. alleged that the defendants violated his Fourth Amendment rights by seizing him, or by causing his seizure, without a warrant, probable cause or exigent circumstances. He also alleged that the defendants violated his right to familial relations, as protected by substantive due process, and finally, he alleged that in removing him, the defendants violated his procedural due process rights.[2] *Id.* at 1009.

---

[2] In his complaint, C.A. broadly alleged violations of his First, Fourth, Fifth, Eighth, Ninth, Tenth, and Fourteenth Amendment rights, but on appeal he only presented the three referenced constitutional theories. *Id.* at 1009.

Following various proceedings, the district court dismissed C.A.'s complaint for failure to state a claim, and C.A. appealed. On appeal, this court reversed and remanded, holding that C.A. could state Fourth Amendment and Fourteenth Amendment claims against all of the defendants except Probation Officer Hansen and Judge Gende. *See id.* at 1026. We also reversed the district court's decision not to exercise supplemental jurisdiction over C.A.'s state law claims, and remanded the case for further proceedings consistent with our decision. *Id.*

While C.A.'s appeal was pending, A.D. reached the age of majority and filed a virtually identical lawsuit against the same defendants, although she also added D. Jean Ortega-Piron, the Guardianship Administrator of the IDCFS, as a defendant. While C.A.'s suit was still pending on appeal, a magistrate judge in A.D.'s case, *sua sponte*, recommended that her suit be dismissed based on the *Rooker-Feldman* doctrine, reasoning that A.D., in effect, was challenging the validity of the state court order of removal. On November 29, 2000, three weeks before we released our opinion reinstating C.A.'s claims, the district court followed the magistrate judge's recommendation and dismissed A.D.'s suit based on the *Rooker-Feldman* doctrine. A.D. appeals to this court. Because A.D.'s appeal involves facts and issues virtually identical to those considered in C.A.'s appeal, we treat her appeal as a successive appeal, *see* Operating Procedure 6(b), and for the reasons discussed below, we reverse and remand.[3]

---

[3] Neither the parties nor the district court had raised the issue of *Rooker-Feldman* in C.A.'s initial case, and in *Brokaw v. Mercer County*, 235 F.3d 1000, this court did not discuss the applicability, or more aptly, inapplicability, of that doctrine.

## II.

At the outset of this analysis we need to underscore two significant features of this appeal. First, before any court proceedings occurred, A.D. alleges a number of facts that implicate several defendants for violations of familial and Fourth Amendment rights. Second, the initial hearing ordering A.D. a temporary ward of the state prohibited any participation by her parents, and the parents had no counsel present to intervene on their or A.D.'s behalf. In that context, on appeal A.D. argues that the district court erred in dismissing her suit based on the *Rooker-Feldman* doctrine.

"The *Rooker-Feldman* doctrine derives its name from two decisions of the Supreme Court, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 68 L. Ed. 362, 44 S. Ct. 149 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983)." *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000). Simply put, the *Rooker-Feldman* doctrine "precludes lower federal court jurisdiction over claims seeking review of state court judgments . . . [because] no matter how erroneous or unconstitutional the state court judgment may be, the Supreme Court of the United States is the only federal court that could have jurisdiction to review a state court judgment."[4] *Id.* Thus, if a claim is barred by the *Rooker-*

---

[4] "In contrast to the *Rooker-Feldman* doctrine, *res judicata* does not concern itself with the determination of whether a district court may properly exercise subject matter jurisdiction in a particular case. Rather, *res judicata* constitutes an affirmative defense and is dependant upon the Full Faith and Credit Statute, 28 U.S.C. §§ 1738, which requires federal courts to give a state court judgment the same preclusive effect it would have

(continued...)

*Feldman* doctrine, a federal court lacks subject matter jurisdiction over the case. *Id.* This court reviews *de novo* a district court's decision that it lacks subject matter jurisdiction based on the *Rooker-Feldman* doctrine. *Id.*

While "[i]n its most straight-forward presentment, the *Rooker-Feldman* doctrine bars federal jurisdiction when the federal plaintiff alleges that her injury was caused by a state court judgment," the exact parameters are less than clear because the doctrine "is not limited to just those claims alleging that the state court judgment itself caused the federal plaintiff's injury; the doctrine also precludes federal jurisdiction over claims inextricably intertwined with a state court determination." *Remer*, 205 F.3d at 996. Discerning "which claims are and which claims are not 'inextricably intertwined' with a state judgment" is a difficult process. *Id.* As we have often explained, "[t]he pivotal inquiry in applying the doctrine is whether the federal plaintiff seeks to set aside a state court judgment or whether he is, in fact, presenting an independent claim." *Id.* (internal quotations omitted).

---

[4] (...continued)
in state court." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 560 (7th Cir. 1999). But the distinction between the application of *Rooker-Feldman* and *res judicata* is a fine one. *See Nesses v. Shepard*, 68 F.3d 1003, 1004 (7th Cir. 1995). Generally speaking, if the complaint attacks the state court judgment, then *Rooker-Feldman* bars subject matter jurisdiction, but if the plaintiff attempts to relitigate the case and thus bypass the state court judgment, the federal court has subject matter jurisdiction, but res judicata bars the suit. *Id.* The defendants do not contend that res judicata bars A.D.'s complaint. However, they do argue alternatively that A.D.'s suit is barred by collateral estoppel—another doctrine often confused with the *Rooker-Feldman* doctrine. We address this alternative argument *infra* at 16-20.

Whether A.D. is presenting an independent claim rather than a claim premised on an injury caused by the state court's judgment in her child removal case is a complex question, as it is often " 'difficult to distinguish' between situations in which the plaintiff is seeking to set aside a state court judgment and ones in which the claim is independent." *Edwards v. Illinois Bd. of Adm. to the Bar*, 261 F.3d 723, 728-29 (7th Cir. 2001) (quoting *Long*, 182 F.3d at 555). A.D. contends that the defendants conspired—prior to any judicial involvement—to cause false child neglect proceedings to be filed, resulting in her removal from her home in violation of her Fourth Amendment and Fourteenth Amendment substantive and procedural due process rights. A.D. explains that she is seeking damages for the conspiracy, not for the state court's decision in the child neglect proceeding. Thus, under these circumstances, A.D. maintains she has an independent claim which is not barred by *Rooker-Feldman*.

In support of her position, A.D. cites *Nesses*, 68 F.3d 1003. In that case, Nesses brought suit in federal court against the lawyers and some of the judges involved in a breach of contract case which he had filed in Indiana state court and lost. *Id.* at 1004. Nesses claimed that his opponents' lawyers used their political clout to turn the state judges against him. *Id.* The district court dismissed Nesses' suit for lack of jurisdiction based on the *Rooker-Feldman* doctrine. *Id.* This court rejected that conclusion, reasoning that the *Rooker-Feldman* doctrine did not bar Nesses' claim because his suit was not premised on a claim that the state court judgment denied him some constitutional right; rather, his federal claim was based on a right independent of the state court proceeding. As we explained in *Nesses*, any other conclusion would mean that "there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state ju-

dicial process as to obtain a favorable judgment, . . . ." *Id.* at 1005. Moreover, we reasoned that such a "result would be inconsistent with cases in which, for example, police officers are sued under 42 U.S.C. § 1983 for having fabricated evidence that resulted in the plaintiff's being convicted in a state court." *Id.*

We conclude that the *Nesses* reasoning applies here. As in *Nesses*, A.D. is not merely claiming that the decision of the state court was incorrect or that the decision violated her constitutional rights; rather, she is alleging that the people involved in the decision to forcibly remove her from her home and her parents and subject her to the custody of the IDCFS violated her constitutional rights, independently of the state court decision.

Other circuits have applied similar reasoning to arrive at this conclusion. *See Holloway v. Brush*, 220 F.3d 767 (6th Cir. 2000*)*, and *Ernst v. Child and Youth Servs. of Chester County*, 108 F.3d 486 (3d Cir. 1997). In *Holloway*, a mother brought a Section 1983 action against the county and the county social worker alleging that they had improperly interfered with her right to the custody of her children. *Holloway*, 220 F.3d at 772. The Sixth Circuit held that the *Rooker-Feldman* doctrine did not bar the mother's federal claim because she was not seeking review of the custody decision, which was an entirely separate state matter. *Id.* at 778-79. Instead, as the court in *Holloway* explained, the mother's claim presented a distinct question as to "whether certain actions in the course of those proceedings may have involved a violation of her federal constitutional rights for which the responsible party may be held liable for damages." *Id.* at 779.

Similarly, in *Ernst*, 108 F.3d 486, the Third Circuit held that *Rooker-Feldman* did not bar a claim based on alleged constitutional violations stemming from child custody

proceedings. *Id.* at 491-92. In *Ernst*, a grandmother, who had sole guardianship of her granddaughter, sued the child welfare department and case workers alleging substantive and procedural due process claims after the defendants removed and retained custody of her granddaughter for five years. *Id.* at 488-89. The court held that "the *Rooker-Feldman* doctrine did not preclude the district court from deciding those claims because a ruling that the defendants violated Ernst's right to substantive due process by making recommendations to the state court out of malice or personal bias would not have required the court to find that the state court judgments made on the basis of those recommendations were erroneous." *Id.* at 491-92. The court further reasoned that "it is clear that deciding the substantive due process claims did not involve federal court review of a state court decision because Ernst's substantive due process claims were never decided by the state court." *Id.* at 492.

On the other hand, in *Goodman v. Sipos*, 259 F.3d 1327 (11th Cir. 2001), the Eleventh Circuit held that *Rooker-Feldman* barred jurisdiction over due process claims brought by a mother and her son against the Georgia Department of Family Services for damages caused by the defendants' allegedly unconstitutional investigation and initiation of state removal proceedings. To the extent *Goodman* conflicts with *Holloway* and *Ernst*, we find *Holloway* and *Ernst* more consistent with this circuit's precedent on *Rooker-Feldman*, namely this court's decisions in *Nesses*, *see supra* at 8-9, and *Long*, *see infra* at 12-13. *Holloway* and *Ernst*, like *Nesses* and *Long*, recognized that constitutional violations may arise independently from state court proceedings, and thus not be barred by *Rooker-Feldman*. Moreover, while *Goodman* expressly rejected the holdings of *Holloway* and *Ernst*, the court in *Goodman* did so in a conclusory manner, providing no analysis. *See Good-*

*man*, 259 F.3d at 1333 n.7. We, however, for the reasons discussed in *Nesses* and *Long*, find *Holloway* and *Ernst* more persuasive and therefore follow their lead in the factual scenario of a child removal proceeding.

The defendants nevertheless argue that A.D.'s claim must be barred by the *Rooker-Feldman* doctrine because a successful constitutional challenge in federal court could mean that the state court erred in deciding A.D. was abused or neglected. However, "the fact that the plaintiff's pursuit of [her] federal claims could ultimately show that the state court judgment was erroneous [does] not automatically make *Rooker-Feldman* applicable." *Long*, 182 F.3d at 555-56. Rather, the appropriate question is whether "the federal plaintiff [is] seeking to set aside a state court judgment, or does [s]he present some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party." *GASH Assoc. v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993). And we have concluded that A.D. presents an independent claim. *See supra* at 9.

The defendants further argue that A.D. is not presenting an independent legal claim because she would not have suffered any injury from the alleged conspiracy absent the state court's order directing her removal and placing her in foster care. This argument presents a more difficult question, and one which we grappled with in *Nesses* and *Long*. In *Nesses*, which, as summarized above, involved a federal suit against the lawyers and some of the judges involved in the plaintiff's unsuccessful breach of contract case, we noted that a federal plaintiff "can without being blocked by the *Rooker-Feldman* doctrine, sue to vindicate [an independent] right and show as part of his claim for damages that the violation caused the decision to be adverse to him and thus did harm him." 68 F.3d at

1005. This language indicates that, even if A.D. would not have suffered any damages absent the state order of wardship, her claim is not barred by the *Rooker-Feldman* doctrine because her claim for damages is based on an alleged independent violation of her constitutional rights. It was this separate constitutional violation which caused the adverse state court decision.

In *Long v. Shorebank Development Corp.*, 182 F.3d 548, this court addressed a similar situation concerning whether the *Rooker-Feldman* doctrine barred the plaintiff's federal claims. In that case, Sasha Long sued her landlords, Shorebank Development Corporation, South Shore Associates, and the attorneys representing the corporate landlords, alleging that the defendants unlawfully caused her to be evicted from her home in violation of her rights under the Fair Debt Collection Practices Act ("FDCPA") and her due process rights. *Id.* at 551. The district court dismissed the complaint concluding that the state court's order of eviction could not be challenged in federal court because of the *Rooker-Feldman* doctrine. *Id.* On appeal, this court first concluded that the plaintiff's FDCPA claims were not barred by the *Rooker-Feldman* doctrine because they were "independent of and complete prior to the entry of the eviction order." *Id.* at 556. *See also id.* (noting that "[i]t makes no difference that Long may also deny the correctness of the eviction order in pursuing these claims"). However, the plaintiff's due process claim presented a more difficult question. Initially, we noted that "it does not seem that Long's due process argument can be considered separate from the eviction order entered against her," because if the proceedings in the state court "resulted in her favor, . . . it seems unlikely that she would have been evicted or lost all of her possessions, custody of her daughter, and her job." *Id.* at 556. We further explained that "while Long complains that the defendants deprived her of her

property without due process in initiating and pursuing the eviction action, the injuries she alleges were complete only when the Circuit Court entered the eviction order against her." *Id.* at 557. We then reasoned that because "[a]bsent the eviction order, Long would not have suffered the injuries for which she now seeks to be compensated," her claims appeared to be barred under *Rooker-Feldman. Id.*

This reasoning seemingly supports the defendants' argument that A.D.'s claims are barred by the *Rooker-Feldman* doctrine since her alleged injury was caused (at least in part) by the state court's ruling in the adjudication of wardship proceedings. However, after discussing the general applicability of the *Rooker-Feldman* doctrine, as summarized above, *Long* further explained that "the *Rooker-Feldman* doctrine can apply only where the plaintiff had a reasonable opportunity to raise his federal claim in state proceedings." *Long,* 182 F.3d at 558 (quoting *Wood v. Orange County,* 715 F.2d 1543, 1547 (11th Cir. 1983)). *Long* concluded that because the plaintiff could not have presented her due process claims before the state court during the forcible entry and detainer proceedings, Long did not have a reasonable opportunity to raise her claims in state court. *Id.* at 558-59. Accordingly, *Long* held that the *Rooker-Feldman* doctrine did not apply to bar the plaintiff's due process claim. *Id.* at 561.

This exception to the *Rooker-Feldman* doctrine is significant, and therefore we reiterate: While the *Rooker-Feldman* doctrine bars federal subject matter jurisdiction over issues raised in state court, and those inextricably intertwined with such issues, "an issue cannot be inextricably intertwined with a state court judgment if the plaintiff did not have a reasonable opportunity to raise the issue in state court proceedings." *Id.* at 558.

In this case, the *Rooker-Feldman* doctrine does not bar A.D.'s claims because she did not have a reasonable opportunity to raise her constitutional claims in the state court child neglect proceedings. That proceeding was brought under the Juvenile Court Act which, at the hearing stage, allowed the court to "consider only the question whether the minor is abused, neglected, delinquent, in need of supervision, or dependent." 705 Ill. Comp. Stat. 405/2-18. Because the Juvenile Court Act did not provide A.D. with a mechanism to present a claim against her relatives and the other state defendants for their alleged violations of her constitutional rights, she did not have a reasonable opportunity to present her claims for purposes of the *Rooker-Feldman* doctrine.[5] *See, e.g., Ernst*, 108 F.3d at 492 (plaintiff's claims were not barred by *Rooker-Feldman* because child dependency adjudication involves a determination that a child is without proper parental care or control, and subsequent custody decisions are made on the basis of the best interests of the child, and therefore plaintiffs did not have a realistic opportunity to present substantive due process claims). *But see Goodman*, 259 F.3d at 1334 (holding that plaintiffs had a reasonable opportunity to present their constitutional claims during state juvenile court proceedings). In fact, at the first court hearing on July 7, 1983, when A.D. was adjudicated a temporary ward of the court and directed to remain in foster care, A.D. wasn't even present and was not represented at that hearing by a guardian ad litem or an attorney.[6] Thus, even though

---

[5]   In ruling that A.D.'s claims were barred by *Rooker-Feldman*, the district court did not consider whether she had a reasonable opportunity to present her claim to the state court.

[6]   We note, additionally, that some of A.D.'s alleged injuries were caused by the removal the previous day before a court proceed-
(continued...)

technically A.D. was a party to the juvenile proceedings, she did not have a reasonable opportunity to raise her constitutional claims during that proceeding. Therefore, even assuming that A.D.'s constitutional claims are not independent of the state court proceedings, because she lacked a reasonable opportunity to present them during the adjudication of wardship hearing, they are not barred by *Rooker-Feldman.*[7]

---

[6] (...continued)
ing had been initiated. Thus, even under the defendants' reading of *Long*, that portion of A.D.'s damage claim would not be barred by *Rooker-Feldman*. In fact, even *Goodman*, which held that *Rooker-Feldman* barred the plaintiffs' due process claims, held that the plaintiffs' claims challenging a search conducted incident to the child neglect investigations were not barred by *Rooker-Feldman* because "[n]o issue involving the search was or could have been raised in the custody proceeding." *Goodman*, 259 F.3d at 1333-34.

[7] In arguing that A.D. could have presented her constitutional claims to the state court, the defendants cite to an extensive supplemental appendix which contains numerous documents purportedly prepared in connection with the state court proceedings. These documents were not presented to the district court, and are thus not part of the record on appeal. The defendants suggest that we may consider these documents since we may take judicial notice of state court proceedings. However, given that the district court did not rely on these documents and that the plaintiff did not have an opportunity to determine their validity or present opposing evidence, we conclude that the appendix material was improperly submitted on appeal. *Cf. United States v. Phillips*, 914 F.2d 835, 840 (7th Cir. 1990) ("An appellant may not attempt to build a new record on appeal to support his position with evidence that was never admitted in the court below."). In any event, nothing in the
(continued...)

Our recent decision in *Jensen v. Foley*, 295 F.3d 745 (7th Cir. 2002), supports this conclusion. In *Jensen*, the parents of infant Kayla Jensen sued the Illinois Department of Children and Family Services, along with local law enforcement officers, after the defendants removed Kayla from her parents' custody without a pre-deprivation hearing. Based on *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), the Jensens argued that the removal was unconstitutional because the defendants lacked probable cause or exigent circumstances. The district court dismissed the Jensens' claims, concluding that they were barred by the *Rooker-Feldman* doctrine. On appeal, we held that the *Rooker-Feldman* doctrine did not apply because that doctrine "bars a plaintiff from bringing a § 1983 suit to remedy an injury *inflicted by* the state court's decision," *id.* at 747 (emphasis in original), whereas "the injury that the plaintiffs here complain of was caused not by the state court's temporary custody order, but by the underlying taking of Kayla by the DCFS agents and local officers, . . . ." *Id.* at 748. Similarly, in this case, A.D.'s injury was caused not by the state court's temporary custody order, but by the defendants' alleged unconstitutional conduct.

However, in *Jensen* while we held that the *Rooker-Feldman* doctrine did not bar the Jensens' suit, we concluded that their claims were barred by collateral estoppel, also known as issue preclusion. In that case, we noted that the

---

[7] (...continued)
supplemental appendix would alter our conclusion that A.D.'s claim is not barred by *Rooker-Feldman*, and therefore we grant A.D.'s motion to strike the appendix. *See Reed v. City of Chicago*, 77 F.3d 1049, 1054 n.6 (7th Cir. 1996) (striking records of state court proceedings which were not part of the district court's record and which were irrelevant to appeal).

Illinois Juvenile Court Act in effect at the time of Kayla's removal required a post-removal hearing to determine whether there was probable cause to believe that she was neglected. *Id.* at 748. Thus, because the state court determined that such probable cause existed, we were "barred by the doctrine of issue preclusion from reconsidering the issue" in the Jensens' federal suit. *Id.*

The defendants in this case similarly argue that the doctrine of collateral estoppel (i.e., issue preclusion) bars A.D.'s claim, submitting our recent decision in *Jensen* as supplemental authority supporting their argument. Because "the preclusive effect of a state court judgment in a federal case is a matter of state rather than of federal law," to consider the defendants' argument we turn to Illinois law on collateral estoppel. *CIGNA Health Care of St. Louis, Inc. v. Kaiser*, 294 F.3d 849, 856 (7th Cir. 2002). "Under Illinois law, collateral estoppel requires that: (1) the issues decided in the prior adjudication are identical to issues presented for adjudication in the current proceeding; (2) there be a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party or in privity with a party in the prior action." *Kalush v. Deluxe Corp.*, 171 F.3d 489, 493 (7th Cir. 1999). Against this backdrop, we consider A.D.'s claims.

A.D. alleged that the defendants conspired with state actors to file false claims of child neglect so as to cause her and her brother to be removed from their parents' home, which in turn the defendants hoped would destroy the Brokaw family, whose religious beliefs the defendants disliked. The state removal proceedings, on the other hand, considered only whether the evidence presented constituted sufficient proof to support an order of temporary wardship. What we have before us is a question involving the difference between a challenge con-

cerning "the sufficiency of the evidence to establish probable cause" and "the integrity of the evidence" used to establish probable cause. *Schertz v. Waupaca County*, 875 F.2d 578, 581 (7th Cir. 1989). The former action is barred by collateral estoppel, while the latter is not. *Id.* Thus, for instance, in *Schertz*, we explained that if "the finding of probable cause is based on the defendant's intentional misrepresentation or concealment of material facts, the plaintiff may be able to proceed on a Fourth Amendment claim challenging the reasonableness of the arrest." *Id.* at 582. While in *Schertz* the plaintiff did not make such a claim, *id.* at 582, in the case before us that is exactly what A.D. did. *See also Bailey v. Andrews*, 811 F.3d 366, 369-70 (holding that probable cause determination made at a criminal hearing was designed to evaluate the sufficiency of the evidence, as opposed to the integrity of the evidence, and accordingly, a Section 1983 action charging a police officer with bad faith was not barred by the doctrine of collateral estoppel because the issues were different).

This contrasts with *Jensen* wherein the plaintiffs argued that there was no probable cause supporting their daughter's removal, but did not allege any sort of conspiracy or filing of false claims of child neglect based on the religious practices of the family. Thus, in *Jensen* the plaintiffs' claims were barred by collateral estoppel. But in this case because the first requirement for collateral estoppel—that the issues decided in the prior adjudication are identical—does not exist, the doctrine of collateral estoppel does not bar A.D.'s claim. *See, e.g., Ernst*, 108 F.3d at 492 n.4 (holding that grandmother's Section 1983 action against child welfare department was not barred by collateral estoppel because the state court merely determined the issue of "proper parental care or control," and did not address the grandmother's constitutional claims premised on the welfare worker's alleged improper bias and motive).

A.D.'s case also differs from *Donald v. Polk County*, 836 F.2d 376 (7th Cir. 1988). In *Donald*, the parents of a child removed from their home sued various state officials alleging a violation of their due process and familial relations rights. This court held that the Donalds' claims were precluded by the doctrine of collateral estoppel because a jury concluded by clear and convincing evidence that their daughter had been physically abused. *Id.* at 382. However, in that case the Donalds did not claim they were not afforded full discovery rights, nor did they cite any "specific instances of a false statement or even an exaggerated statement in any of the defendants' reports, petitions, or testimony." *Id.* at 381. The Donalds also did not propose any "reasonable motive why the defendants would be prejudiced against the Donalds." *Id.* Based on these circumstances, we concluded the conclusory allegations of bad faith on the part of the defendants prevented the Donalds from relying on a claim of fraud in the underlying custodial hearing to overcome the doctrine of collateral estoppel. In contrast, in this case A.D. has made specific and detailed allegations concerning not only the purported false statements, but the motive underlying those statements, as well as a motive for a state actor—her uncle—to have joined the conspiracy. This distinguishes A.D.'s case from *Donald*.

Finally, before closing we note that not only did the state custodial proceedings involving A.D. address different issues, but based on A.D.'s allegations there is serious concern about the fairness and integrity of those proceedings. As we explained in *CIGNA Health*, 294 F.3d 849, notwithstanding the doctrine of collateral estoppel, "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Id.* at 855-856. (internal citations omitted). And "Illinois law denies collateral estoppel

effect to a finding not made on the basis of a fair and adequate hearing." *Id.* (citing *Fried v. Polk Bros., Inc.*, 190 Ill.App.3d 871, 138 Ill.Dec. 105, 546 N.E.2d 1160, 1164 (Ill.App.1989); *Coronet Ins. Co. v. Booker*, 158 Ill.App.3d 466, 110 Ill.Dec. 616, 511 N.E.2d 793, 796-97 (Ill.App.1987)). For this added reason, the defendants' reliance on collateral estoppel fails. *But see Donald*, 836 F.2d at 383 (noting that one Wisconsin case suggests that under Wisconsin collateral estoppel law, a plaintiff who did not seek to remedy procedural unfairness through the appellate process cannot raise the issue collaterally).

## III.

If A.D. Brokaw succeeds in her federal case, that may admittedly call into question the validity of the underlying state child neglect proceeding. Nonetheless, the *Rooker-Feldman* doctrine does not bar her suit because A.D. did not have a reasonable opportunity to raise her claims in state court. Therefore, we conclude that the district court erred in dismissing A.D.'s suit under *Rooker-Feldman* for lack of subject matter jurisdiction. Additionally, the defendants' argument on appeal that A.D. is barred by collateral estoppel from maintaining this suit is misplaced. The issue in A.D.'s federal case is not identical to the one presented in the state custody proceedings, and in any event, based on A.D.'s allegations any findings stemming from the state court hearings were not the product of a fair hearing. For these and the forgoing reasons, we REVERSE and REMAND.[8] On remand, the district court should con-

---

[8] The defendants presented numerous alternative arguments for affirmance, but none of those arguments concern subject

(continued...)

sider whether consolidation of C.A. and A.D.'s suits is appropriate.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[8] (...continued)
matter jurisdiction. Rather, the defendants are trying to obtain summary judgment based on different legal theories and/or defenses, without having given the district court or the plaintiff an opportunity to present contrary factual and legal arguments. Therefore, those alternative arguments are not appropriately before this court and should be considered in the first instance by the district court on remand. *See Goodman*, 259 F.3d at 1330 n.5. *See, e.g., Box v. A&P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985) (internal citations omitted) ("On appeal of a summary judgment, the appellate court can usually consider only those matters that were presented to the trial court. True, we may affirm a summary judgment on any ground that finds support in the record, but the ground must have been adequately presented in the trial court so that the non-moving party had an opportunity to submit affidavits or other evidence and contest the issue.").